## DECLARATION OF SPECIAL AGENT DAVID HARDING

I, Special Agent David Harding with the Federal Bureau of Investigation (FBI) assigned to the Charlotte, North Carolina Field Office with duty in the Raleigh Resident Agency, pursuant to 28 U.S.C. § 1746 and the laws of the United States, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

## INTRODUCTION

1. This declaration is made in support of a complaint to forfeit funds previously seized from a virtual currency (VC) address [hereafter referred to as the "Subject USDT Address"]. This address contained proceeds and/or commingled funds of multiple cryptocurrency investment fraud schemes, whereby one or more criminal fraudsters used a fraudulent cryptocurrency exchange to commit wire fraud by inducing victims known as A.B., Y.Y., F.O., and J.L. to send money to VC wallets controlled by the fraudsters. Once they received the VC, it was rapidly transferred to numerous other VC addresses, and ultimately consolidated in a single address, which was subsequently frozen by the FBI. The FBI previously obtained a seizure warrant (Case No. 5:24-MJ-2556-BM) pursuant to 18 U.S.C. § 981(b) to bring traceable proceeds and other commingled funds involved in money laundering into government custody and now submit this declaration to support the funds' forfeiture.

## DECLARANT'S BACKGROUND AND EXPERIENCE

2. I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) assigned to the Charlotte, North Carolina Field Office with duty in the Raleigh Resident Agency. I have been employed as a Special Agent with the FBI since 2012 and worked a variety of federal criminal investigations, including but not limited to complex financial crimes. I have completed extensive training. This training included instruction in general law enforcement and criminal investigations

1

GOVERNMENT
EXHIBIT
A

to include violations of Title 18, United States Code, section 1343 (Wire Fraud) and section 1956 (Money Laundering).

3. In my official capacity as a Special Agent, I have obtained the information set forth in this declaration through personal knowledge and/or directly from persons having knowledge of the facts of this case, including, as relevant, from speaking with, or review of sources of information or other law enforcement personnel.

## PURPOSE OF THE DECLARATION

4. I make this declaration in support of the civil forfeiture of the proceeds of a criminal scheme to defraud A.B., Y.Y., F.O., and J.L., executed in violation of 18 U.S.C. §§ 1343 and 1349 (wire fraud and conspiracy to commit wire fraud); and co-mingled funds that were involved in the unlawful laundering of such property in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1956(h) (money laundering and conspiracy to commit money laundering). Specifically, this declaration supports the civil forfeiture of the following assets that were previously seized and brought into government custody on January 22, 2025:

> a. 8,500,000.00 USDT virtual currency (formerly held in
>
> **Subject        USDT        Address**
>
> TSprrA1QUawro9xkQ9UFG3Bb2VwxgvJVvE)

5. As explained below, the foregoing funds represent directly traceable criminal proceeds and/or money involved in the laundering of those proceeds, which were derived from a criminal fraud scheme that successfully defrauded A.B., Y.Y., F.O., and J.L. by impersonating a legitimate cryptocurrency exchange and inducing A.B., Y.Y., F.O., and J.L. to transfer VC belonging to them to wallets in the control of the fraudster(s).

2

## **BACKGROUND OF CRYPTOCURRENCY**

6. Based on my training, research, education, and experience, I am familiar with the following relevant terms and definitions:

      a.    *Cryptocurrency and Blockchain Generally*: Cryptocurrency, a type of virtual currency (VC), is a decentralized, peer-to-peer, network-based medium of value or exchange that may be used as a substitute for fiat currency to buy goods or services or exchanged for fiat currency or other cryptocurrencies. Examples of cryptocurrency are Bitcoin, Tether, USD Coin, and DAI. Each unit of cryptocurrency is often referred to as a "coin" or "token." In general, most cryptocurrencies are considered fungible assets. For example, Bitcoin is considered fungible because each unit of Bitcoin is equivalent to any other unit, meaning they have the same quality and functionality. Regardless of when a unit of Bitcoin was issued ("mined"), all Bitcoin units are part of the same blockchain and have the same functionality. Cryptocurrency can exist digitally on the Internet, in an electronic storage device, or in cloud-based servers. Users of cryptocurrency use public and private keys to transfer cryptocurrency from one person or place to another. A public key is typically a set of numbers and/or letters that a cryptocurrency user shares with other users to engage in a transaction in cryptocurrency, whereas a private key is typically a set of numbers and/or letters that the user of an account maintains privately to access his or her cryptocurrency. Cryptocurrency can be exchanged directly person to person, through a cryptocurrency exchange, or through other intermediaries. Generally,

3

cryptocurrency is not issued by any government, bank, or company; it is instead generated and controlled through computer software operating on a decentralized peer-to-peer network. As such, most cryptocurrencies have a "blockchain," which is a distributed public ledger, run by the decentralized network, containing an immutable and historical record of every transaction.[1] Although many cryptocurrencies are or purport to be pseudonymous, often law enforcement and currency exchangers can use the blockchain to analyze transactions in cryptocurrency, identify individuals who are using cryptocurrency platforms for illicit purposes, and trace fraud proceeds from victims to one or more exchanges or wallets.

b. *Wallets*: Cryptocurrency is often stored in a virtual account called a wallet, which can exist in, among other forms, an external computer device, a computer, on an application, or online. Wallets are software programs that interface with blockchains and generate and/or store public and private keys used to send and receive cryptocurrency. Access to a wallet and the cryptocurrency therein is typically protected by a password only known to the owner or user of the wallet. Wallets can be either "custodial" or "non-custodial" (also referred to as "centralized/decentralized" or "hosted/non-hosted"). In the case of a non-custodial wallet, the owner of the wallet has sole control of the wallet's private keys, which enable access to the wallet and any funds contained therein. With a custodial wallet, another party controls the private keys to the wallet. This is

---

[1] Some cryptocurrencies operate on blockchains that are not public and operate in such a way to obfuscate transactions, making it difficult to trace or attribute transactions.

usually a cryptocurrency exchange, and the relationship between the exchange and the customer can be considered analogous to the relationship between a traditional bank and its customers, where the bank securely maintains funds deposited by a bank customer.

c. *Exchanges/Exchangers*: Virtual currency "exchangers" and "exchanges" (also referred to as a "Virtual Asset Service Provider" [VASP]), such as Binance, Coinbase, Kraken, and Crypto.com, are individuals or companies that exchange virtual currency for other currencies, including U.S. dollars. Exchanges facilitate the purchase, sale, and transfer of a variety of digital currencies.

d. *Centralized/Decentralized Exchanges*: Centralized exchanges generally maintain a custodial role for the wallets of its customers, and function as trusted intermediaries in cryptocurrency transactions. Decentralized exchanges consist of peer-to-peer marketplaces where users can trade cryptocurrencies in a non-custodial manner, without the need for an intermediary to facilitate the transfer and custody of funds. Decentralized exchanges are often used to trade, or "swap", one type of cryptocurrency for another, for which the user pays a transaction fee. Centralized exchanges that conduct business in the United States are required to verify their customers' identities and abide by Know-Your-Customer/Anti-Money Laundering (KYC/AML) regulations.

e. *Tether*: Tether, widely known as "USDT," is a blockchain-based cryptocurrency whose tokens in circulation are backed by an equivalent amount of U.S. dollars, making it what is known as a "stablecoin." USDT is issued by Tether Ltd., an

5

international company. Tether is connected to Bitfinex, a cryptocurrency exchange registered in the British Virgin Islands.

f. USDT is hosted on the Ethereum and Bitcoin blockchains, among others. Ethereum ("ETH") is a cryptocurrency that is open source, public, has a blockchain, and is distributed on a platform that uses "smart contract" technology. The public ledger is the digital trail of the Ethereum blockchain, which allows anyone to track the movement of ETH. Smart contracts allow developers to create markets, store registries of debts, and move funds in accordance with the instructions provided in the contract's code, without any type of middleman or counterparty controlling a desired or politically motivated outcome, all while using the Ethereum blockchain protocol to maintain transparency. Smart contract technology is one of Ethereum's distinguishing characteristics and an important tool for companies or individuals executing trades on the Ethereum blockchain. When engaged, smart contracts automatically execute according to the terms of the contract written into lines of code. A transaction contemplated by a smart contract occurs on the Ethereum blockchain and is both trackable and irreversible.

g. Like other virtual currencies, USDT is sent to and received from USDT "addresses." A USDT address is somewhat analogous to a bank account number and is represented as a 26-to 35-character-long case-sensitive string of letters and numbers. Users can operate multiple USDT addresses at any given time, with the possibility of using a unique USDT address for every transaction. Although the identity of a USDT address owner is generally anonymous (unless the owner opts to make the information publicly available), analysis of the blockchain can often

6

be used to identify the owner of a particular USDT address. The analysis can also, in some instances, reveal additional addresses controlled by the same individual or entity. Unlike Bitcoin, one of the most popular cryptocurrencies in use today, USDT is "centralized", meaning that it is issued and controlled by a governing body. Most other cryptocurrencies are "decentralized" and have no such governing body.

## FACTS SUPPORTING FORFEITURE

### THE SCHEME

7. This case concerns cryptocurrency investment fraud scams perpetrated on victims throughout the United States, including in the Eastern District of North Carolina. The scheme often begins when a fraudster sends a victim a seemingly innocuous and misdialed text message, or through sending an unsolicited message to a victim's social media account. From there, the fraudster attempts to establish a more personal relationship with the victim by using manipulative tactics similar to those used in online romance scams.

8. Once the fraudster has established a trusted relationship with the victim, the fraudster brings the victim into a cryptocurrency investment scheme. This fraudster typically claims to have a technique to quickly make large profits, either through personal expertise with cryptocurrency, or through a trusted relative or friend with insider information. The investment schemes have the appearance of a legitimate enterprise through the use of fabricated interfaces, derivative websites that appear related to legitimate companies, and other techniques designed to bolster the scheme's legitimacy. This generally includes a fake investment platform operated through a website or mobile application that displays a fictitious investment portfolio with abnormally large investment returns. The investment platforms are a ruse, and the funds contributed are routed directly to a

7

cryptocurrency address the fraudsters control. In reality, the victims do not have actual "accounts" at the fake companies – as soon as the victim sends cryptocurrency to the deposit address provided by the fraudsters, it is immediately moved through many other wallets in order to launder the funds and make them harder to trace. The victims are able to see what they believe are their deposits on the fraudulent website, and the purported large returns on their investments are designed to convince them to invest more.

9. When the victims do attempt to withdraw their funds, they are unable to do so and are often met with various excuses, such as being told they are required to pay "taxes" or "penalties" in order to release their funds. The "tax" payments are an attempt by the scammers to elicit even more money out of the victims. The fraudsters, in the form of "customer service" for the fraudulent website, will continue to ask for additional payments from the victim, and will not release the funds regardless of how much is paid.

10. In this case, multiple victims, one of whom (hereinafter "A.B.") resides in the Eastern District of North Carolina, were victims of a cryptocurrency investment fraud scheme. This affidavit discusses four victims ("A.B.", "Y.Y.", "F.O.", and "J.L.") of the same or similar organization perpetrating the same investment fraud scheme. The victims were approached and recruited through the guise of a romantic or unrelated business relationship in order to develop a trusted relationship. Once the relationship was established, the fraudster introduced the victims to a fictitious trading platform. Based on an analysis of the fake investment platforms that all the victims were directed to, as well as tracing of the cryptocurrency that the victims sent, agents believe that the victims were all likely victimized by the same person or group. The following sections detail the background of one victim's enticement into the scheme. This is followed by a

section which demonstrates the link between the victims and shows that there are likely to be many more additional victims of the same group.

Victim A.B.

11. A.B. is 47 years old female and a resident of Cary, North Carolina. In the spring of 2024, a person claiming to be a man named "Andy Tan" contacted A.B. via the online dating application Coffee Meets Bagel and they began exchanging messages not related to investing or cryptocurrency. They later communicated via WhatsApp. Tan said he worked in real estate in Los Angeles, California. Tan provided pictures of himself in his communication with A.B. Open source searches identified an individual of the same name in real estate in the Los Angeles area, however the pictures provided by Tan to A.B. did not match those identified through the open source searches.

12. Tan introduced A.B. to cryptocurrency investing and showed her the investment platform, "piwbitgnz.com". TAN encouraged A.B. to start with smaller amounts first and he would train her. She first sent $1,000 through a Bitcoin ATM, and after that she was instructed to open an account at Crypto.com and to download the imToken app on her phone, which she used to access piwbitgnz.com. TAN encouraged A.B. to do a test withdrawal to show that the platform was legitimate. A.B. was able to withdraw $2,000 and saw the money come back into her bank account. TAN said that if A.B. did larger trades then she would get a higher percent return on the trades. TAN also said he would add $60,000 to A.B.'s account. Between May and June 2024, A.B. transferred approximately $146,000 in cryptocurrency to what she believed was the wallet in her piwbitgnz account. A.B. sent all transactions from her Crypto.com account to her imToken Ethereum wallet, and then to the scam platform.

13. A.B.'s piwbitgnz account eventually reached a balance of $950,000. TAN told A.B. to try withdrawing the entire balance. When A.B. submitted a withdrawal request the withdrawal was blocked. TAN told A.B. to talk to customer service to unfreeze her funds. A.B. was told in order to process her withdrawal she had to pay taxes of 16.5% and was told that was $158,000. A.B. had no more money and could not pay the taxes. A.B. subsequently reported the fraud to the FBI Internet Crime Complaint Center on August 3, 2023.

### Tracing of Victim A.B.'s Funds to the **Subject USDT Address**

14. One of A.B.'s cryptocurrency transactions was traced to the **Subject USDT Address**, as detailed below. The traces were conducted using the Last-In-First-Out accounting principle – meaning the most recently deposited items are recorded as the next withdrawal. For clarity, all VC addresses have been shortened to the first eight characters.

15. On June 13, 2024, A.B. sent 5.66776 ETH from A.B.'s Crypto.com to address 0x93424C. From there, the funds were sent to 0x62a7c and on through a series of several transfers to address 0x18E776. The funds were then converted to 19,731.27 DAI and transferred to address 0x10c5a8. The funds were commingled with additional DAI, transferred through several more addresses, converted to USDT, and ultimately sent to the **Subject USDT Address** on June 20, 2024, as part of a 999,999 USDT transaction.

16. As of May 8, 2024, when the address was frozen by Tether at FBI request, approximately 8,500,000 USDT was present in the **Subject USDT Address**, 20,000 USDT of which can be traced as proceeds directly from A.B.

### Victim Y.Y.

17. Y.Y. is a 56-year-old female resident of Olathe, Kansas. In the spring of 2024, Y.Y. met a person claiming to be a man named Jian Ming Li on the dating website, elitesingles.com.

After initially communicating on the dating site, Y.Y. said they began communicating on WhatsApp. Li claimed to live in Salt Lake City, Utah and work as a computer engineer. Li also said he was born in the Fujian Province in China but moved to the United States in 2003.

18. Y.Y. did not want to participate in cryptocurrency trading initially, however eventually Li convinced her to invest. Y.Y. said she did not know anything about cryptocurrency at the time, but Li told her he would help her along the way. Y.Y. was instructed to download Kraken Pro, Trust Wallet, and Strike to her phone. Then Y.Y. set up an account at karopoloes.com, which she was told by Li was a cryptocurrency investment platform. Li specifically instructed Y.Y. to copy and paste the link Li provided directly into the browser to get to the karapoloes website.

19. From April 8, 2024 to May 11, 2024, Y.Y. transferred approximately $1.31 million to her account at karapoloes.com through Kraken and Strike. Y.Y. said she made her first two deposits through Kraken and the remaining deposits through Strike. All transfers were then moved to Trust Wallet and from there Y.Y. was directed to transfer the cryptocurrency to karapoloes.com. At some point, Y.Y. said the website changed from karapoloes.com to karoo.ink, but the platform and trading account looked and worked the same. In addition, Li told Y.Y. that he had transferred $455,100 worth of cryptocurrency into her account.



20. After making the investment, Y.Y. became concerned the investment was too risky. On May 25, 2024, Y.Y. attempted to make a withdrawal from her account, but the platform sent her a message stating, "According to the system detection your investment account funds were transferred from an unknown wallet address to the same investment account of yours in the amount of $455,100. You are required to deposit 50 % of this amount, $227,550, to ensure that the funds invested in your account are not used for illegal fundraising, money laundering or other issues." Y.Y. noted that the transfer amount from the unknown wallet was the exact amount Li had deposited into her account. Y.Y. told Li she did not have any more money, but he continued to push her for more. Y.Y. advised after some time had passed, she checked the website, the site was no longer working and it was then she realized she had been scammed. Y.Y. reported the fraud to the FBI Internet Crime Complaint Center on May 28, 2024.

Tracing of Victim Y.Y.'s Funds to the <strong>Subject USDT Addresses</strong>

21. One of Y.Y.'s cryptocurrency transactions was traced to the **Subject USDT Address**, as detailed below. The traces were conducted using the Last-In-First-Out accounting principle –

meaning the most recently deposited items are recorded as the next withdrawal. For clarity, all cryptocurrency addresses have been shortened to the first eight characters.

Tracing of Victim Y.Y.'s Funds to the <b>Subject USDT Address</b>

22. One of Y.Y.'s cryptocurrency transactions was traced to the **Subject USDT Address**, as detailed below. The traces were conducted using the Last-In-First-Out accounting principle – meaning the most recently deposited items are recorded as the next withdrawal. For clarity, all VC addresses have been shortened to the first eight characters.

23. On April 15, 2024, Y.Y. sent 31.372936 ETH from Y.Y.'s Crypto.com to address 0xd124fb where it was commingled and converted to 99,499.87 DAI. From there, the funds went to 0x2d6975, were further consolidated with other funds, and moved through a series of transfers to address 0xa892b0. The funds were then converted to Tether and sent through several more addresses, and ultimately sent to the **Subject USDT Address** on June 20, 2024, as part of a 999,999 USDT transaction

24. As of May 8, 2024, when the address was frozen by Tether at FBI request, approximately 8,500,000 USDT was present in the **Subject USDT Address**, 98,000 USDT of which can be traced as proceeds directly from Y.Y.

Victim F.O.

25. F.O., a 56-year old female residing in La Mirada California was contacted via text message in early January 2024 by an individual who went by the name of Niana Shane Cheng. Niana described herself as female and Filipino. Niana and her husband, Ayden, were interested in a property F.O. had sold previously and also interested in purchasing real estate in California. F.O. had been a real estate agent in California for over 20 years so her information was publicly available online and it was not uncommon for her to be contacted like this. Niana provided

information, including a portfolio of properties they owned and also verified a large amount of cryptocurrency they had available to purchase properties. Niana also said they would be purchasing the properties using cryptocurrency. F.O. said she was not phased by this as she had worked with buyers using cryptocurrency in the past.

26. Soon after F.O. began communicating with Niana, Niana introduced F.O. to investing in Cryptocurrency. Niana said Ayden was an options trader. F.O. initially invested small amounts starting in January 2024, but as her investment grew, she began investing more cryptocurrency.

27. Per the instructions from Niana, F.O. transferred money from her bank account to wallets she created, first at Kraken then at Crypto.com. Between January and April 2024, F.O transferred approximately $684,000 from her bank account to her wallets at either Kraken or Crypto.com. Niana then had F.O. create an account at a cryptocurrency trading website called Dopex and was provided a link to that website. Once the account was set up, F.O. transferred cryptocurrency from her exchange accounts to her account at Dopex. From there, she believed she successfully traded and grew her account balance considerably. F.O. would go on to take money from her children's' college savings accounts and hers and her husband's retirement accounts, incurring large penalties and taxes.

28. F.O. said at some point, the Dopex website stopped working and Niana told her the website address moved to Dopax. When F.O. went to the Dopax website, she was able to access her account using the same login information. On multiple occasions, F.O. attempted to withdraw funds from her account. However when she attempted to withdraw funds, Dopex would freeze her account and tell her they would unfreeze it after she paid a fee or penalty. When she paid the amount requested and attempt to withdraw funds, they would freeze again and claim she needed

14

to then pay taxes on the earnings in her account. F.O. was never able to withdraw any of her funds from Dopex.

  

29. Niana provided multiple photos allegedly of her and Ayden at their wedding. An internet search of the photos identified the photos on other social media accounts used by individuals under different identities. F.O. was contacted by the FBI on or about November 5, 2024 as she was identified as a possible victim in a cryptocurrency investment fraud.

Tracing of Victim F.O.'s Funds to the <strong>Subject USDT Address</strong>

30. One of F.O.'s cryptocurrency transactions was traced to the **Subject USDT Address**, as detailed below. The traces were conducted using the Last-In-First-Out accounting principle – meaning the most recently deposited items are recorded as the next withdrawal. For clarity, all cryptocurrency addresses have been shortened to the first eight characters.

31. On April 4, 2024, F.O. sent 24.8928 ETH from F.F.'s Crypto.com to address 0x838a29e where it was commingled and transferred again to 0xb4e22. The funds were then converted to 92,712.38 DAI. From there, the funds went to 0x6ad581, were further consolidated with other funds, and moved through a series of transfers to address 0xa892b0. The funds were then converted to Tether and sent through several more addresses, and ultimately sent to the **Subject USDT Address** on June 20, 2024, as part of a 999,999 USDT transaction

32. As of May 8, 2024, when the address was frozen by Tether at FBI request, approximately 8,500,000 USDT was present in the **Subject USDT Address**, 82,000 USDT of which can be traced as proceeds directly from F.O.

<u>Victim J.L.</u>

33. J.L, a 43-year old female, met an individual named David Chen (Chinese name: Haojin Chen) through the dating app eHarmony on or about March 21, 2024. Chen claimed to live in Ventura, California and to have been born in Singapore but originally from China. Over time, J.L. and Chen developed a close online relationship, and he began guiding J.L. in trading USDT cryptocurrency on a platform called m.maocroner.com, which showed a 15% profit rate when J.L started trading on April 1, 2024.

34. According to m.maocroner.com, J.L. made approximately $5,000 that first day. Chen then guided J.L. on how to withdraw $2,000 from her account and transfer it back to her bank account to celebrate and treat herself. J.L. cam to believe the small initial withdrawal was likely "proof of profit" where J.L. believed she began to be manipulated.




35. Under Chen's guidance, J.L. wired funds from various sources to her bank account, then to her Crypto.com fiat wallet, where she purchased USDC. J.L. then transferred the USDC to her Trust Wallet and finally deposited the cryptocurrency into the m.maocroner.com platform for trading. Chen mentioned that she could reach a goal of $2 million, which they could use to buy a new home for their future marriage.

36. Between 4/4/2024 and 4/12/2024, J.L. transferred $293,000 to her m.maocroner.com account. The sources of these funds included bank savings, 401k, Roth IRA and 529 college savings accounts for her children. J.L. also took out a $28,000 home equity line of credit to invest, however her bank began questioning her transfers and informed her she may have been a victim of a romance scam. J.L. did not send the $28,000 transfer from her equity line. When J.L. attempted to withdrawal her funds, she was required to pay exhorbitant fees, such as 30% of all of her deposits. J.L. was never able to withdrawal any funds from her m.maocroner.com account except the $2,000 withdrawal she made when she first started trading. On May 2, 2024, J.L. filed a complaint with the FBI through the internet crimes complaint website, IC3.GOV.



<u>Tracing of Victim J.L.'s Funds to the **Subject USDT Address**</u>

37. One of J.L.'s cryptocurrency transactions was traced to the **Subject USDT Address**, as detailed below. The traces were conducted using the Last-In-First-Out accounting principle – meaning the most recently deposited items are recorded as the next withdrawal. For clarity, all cryptocurrency addresses have been shortened to the first eight characters.

38. On April 4, 2024, J.L. sent 49,253 USDC from J.L.'s Crypto.com to address 0x2d3697 where it was commingled and converted to 52,175 DAI. From there, the funds went to 0x6a5d81, were further consolidated with other funds, and moved through a series of transfers to address 0xa892b0. The funds were then converted to Tether and sent through several more addresses, and ultimately sent to the **Subject USDT Address** on June 20, 2024, as part of a 999,999 USDT transaction

39. As of May 8, 2024, when the address was frozen by Tether at FBI request, approximately 8,500,000 USDT was present in the **Subject USDT Address**, 50,000 USDT of which can be traced as proceeds directly from J.L.

18

40. Through the investigation, it was noted the owner(s) of the **Subject USDT Address** engaged in activity intended to obfuscate the origins of the cryptocurrency being laundered. A bridge was used to transfer the cryptocurrency from the Etherium blockchain to the Tron blockchain. While it is possible to trace cryptocurrency forward through a bridge, it is extremely difficult or impossible to backtrace through a bridge. As a result, determining the cryptocurrency transferred through the Tron wallet originated from victims of cryptocurrency investment fraud is much more difficult. Further, a high volume of large value transactions passed through the first wallet after the bridge on the Tron blockchain with no apparent purpose other than to transfer the cryptocurrency to other wallets on the blockchain. It should be further noted that no claimant came forward to exert a claim on the seized wallet from the date Tether agreed to freeze the wallet to the date of this seizure warrant application. This provides additional support that there is no purpose for this wallet other than to launder proceeds of illicit activity.

41. There are several factors which indicate that the victims described above are part of the same larger fraud scheme. These factors show that the **Subject USDT Address** has been used not only to launder the proceeds of criminal activity received from "A.B.", "Y.Y.", "F.O.", and "J.L.", but from numerous other victims, some of which are known and others who are unknown at this time.

> a. *Shared cryptocurrency addresses and patterns of activity:* In cryptocurrency investment fraud schemes, victims are often given individual "burner" crypto addresses which are provided only to that particular victim. When a victim sends cryptocurrency to the burner address, the crypto is then quickly sent to another address where funds from multiple victims are consolidated. There are often

19

multiple layers of consolidation addresses, which can be seen in this case. Specifically:

    **i.**    The tracing of victim transactions in this case showed a pattern of initial investment in ETH, rapid transfers through several addresses, conversion to DAI, commingled and then converted to USDT. After conversion to USDT, the funds were consolidated and transferred again through several accounts.

    **ii.**    In sum, based on my training, experience, and the investigation to date, I believe that each victim transaction shows a common pattern of moving to an initial consolidation address, where it is converted to what appears to be the scammers' favored form of crypto, USDT. The USDT is then sent through a bridge to the Tron blockchain and on to a secondary consolidation address, where it is further consolidated sent to several more addresses. This was the common pattern for the transactions conducted on funds originating from "A.B.", "Y.Y.", "F.O.", and "J.L."

b.    This chart was created by "backtracing" from the consolidation addresses that had been identified when tracing A.B.'s transactions on the ethereum blockchain before the funds were transferred through the bridge. In backtracing, instead of tracing forward to find out where the funds were sent, transactions were traced backward to see what other addresses had sent funds to the consolidation addresses, and where those funds originated from, which in every case was an exchange. In my experience this technique is very successful in locating

additional victims who may not have reported the scam or may not yet be aware they are a victim.

c. *Other Victim Reporting:* A search of the FBI's IC3 identified other potential victims of this scam. These victims were located by searching for consolidated addresses in the database. Each of these victims reported a similar scam to those detailed here, with some variations in how they were recruited for the scam, the name the scammer used when contacting the victim, and the specific URL used to access the platform.

## CONCLUSION

42. Based on information derived from the foregoing investigation, there is probable cause to conclude that the 8,500,000.00 USDT virtual currency (formerly held in **Subject USDT Address** TSprrA1QUawro9xkQ9UFG3Bb2VwxgvJVvE) constitutes the proceeds of a wire fraud scheme in violation of Title 18, United States Code, Sections 1343 and 1349 (wire fraud and conspiracy to commit wire fraud) and is therefore forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(C). In addition, there is probable cause to believe that the 8,500,000.00 USDT virtual currency (formerly held in **Subject USDT Address** TSprrA1QUawro9xkQ9UFG3Bb2VwxgvJVvE) constitutes property involved in money laundering transactions in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 1956(h) (money laundering and conspiracy to commit money laundering), and is therefore subject to seizure and forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1)(A).

43. The foregoing facts are furthermore sufficient to support a reasonable belief that the defendant property is forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and/or 18 U.S.C. 981(a)(1)(A).

Executed this 15th day of August, 2025.

David Harding
Special Agent
Federal Bureau of Investigation